**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

KIM GENTRY; and KIM GENTRY
DRESSAGE LLC,

      Plaintiffs,

v.                                Case No. 5:25-cv-50-RBD-PRL

MELISSA PRELL; WILLIAM
B. RUSSELL; and PETERSON
& SMITH EQUINE HOSPITAL,
LLC,

      Defendants.

_____

### ORDER

Before the Court are the parties' cross-motions for summary judgment (Docs. 49, 53, 54), Defendants' motions to exclude two of Plaintiffs' experts (Docs. 51, 52), and Plaintiffs' objection (Doc. 68) to U.S. Magistrate Judge Philip R. Lammens's Report and Recommendation ("R&R") (Doc. 66) on Plaintiffs' motion for sanctions. (Doc. 34.)

### BACKGROUND

This professional negligence case concerns the untimely death of Plaintiff Kim Gentry's beloved horse, Dantique, and Gentry's dashed hopes to perpetuate Dantique's bloodline.

Gentry trains riders and horses in dressage. (Doc. 54-5, p. 11:3–5.) In June of

2023, she purchased Dantique, seeing in her great potential as a dressage horse. (*Id.* at 16:4–25.) Dantique also had desirable bloodlines, so Gentry hoped to one day use her as a breeding mare. (*Id.* at 17:7–16.)

After a choking incident, Gentry took Dantique to Palm Beach Equine for examination and treatment. (*Id.* at 20:1–12.) Dantique was diagnosed with end-stage heart failure, so Gentry elected to euthanize her. (*Id.* at 13:7–11, 21:7–24.) But Gentry also desired to have Dantique's ovaries removed in the hopes of producing offspring. (*Id.* at 23:17–25.)

Palm Beach Equine removed Dantique's ovaries. (Doc. 59-4, p. 21:1–14.) Dantique was euthanized outside, and the veterinarian removed her ovaries after her death. (Doc. 49-4, p. 47:1–19.)   Dantique's ovaries were removed by veterinarian Justin McNaughten, who testified that while everything was done to avoid contamination, the procedure cannot be performed in a completely sterile manner, and there is always a risk of contamination. (Doc. 59-4, pp. 24:3–25:10.) Palm Beach Equine rinsed the ovaries and prepared them for transport to Defendant Peterson & Smith Equine Hospital, LLC ("the Hospital") for the second step: the removal of the oocytes from the ovaries. (*Id.* at 21:10–14; Doc. 54-5, p. 27:8–10; Doc. 59-6, p. 28:8–14.) McNaughten testified that he was surprised that Gentry did not hire Palm Beach Equine to do both steps of the procedure because there is a risk of decomposition if the oocytes are not timely removed from the

2

ovaries. (Doc. 59-4, pp. 29:20–30:17.)

Once the Hospital received the ovaries, Defendant Melissa Prell, a veterinarian who ran the Hospital's Advanced Fertility Center ("AFC"), removed the oocytes. (Doc. 59-6, pp. 28:8–14, 77:2–83:11.) The AFC operated under Prell's license, and she ran it without any substantive oversight. (Doc. 53-2, pp. 8:8–9:15, 49:6–50:4.) Defendant William Russell is a partner at the Hospital. (Doc. 53-2, pp. 5:25–6:2.) While Russell partly owns the AFC through being a partner at the Hospital, he did not supervise the AFC, nor did he make hiring and firing decisions there. (*See id.* at 10:20–22, 14:10–15.) Russell never practiced at the AFC. (*Id.* at 33:25–34:2.)

After the oocytes were removed, Jamie Farmer, the AFC's office manager, assisted with post-removal procedures, including washing the oocytes and physically placing them in maturation media prior to fertilization. (*Id.* at 28:22–23, 29:17–20, 96:1–19, 111:19–112:5.) But Farmer was not a Florida-certified veterinary technician. (*Id.* at 28:24–29:15.) Her only training consisted of a course in Italy where she learned about the procedure to implant oocytes in a recipient mare. (*Id.* at 37:3–38:6.) After the oocytes were removed, Prell and Farmer placed all the oocytes together into one test tube filled with maturation media. (Doc. 59-6, p. 123:8–21.) Farmer testified that in the lab where the embryos were held in holding media and transferred to maturation media, people could wear shoes

from outside the lab; hair nets and gloves were not required; and lab coats were laundered only once a week. (Doc. 59-6, p. 137:11–19; Doc. 49-2, pp. 131:14–25, 133:5–10, 134:2–15.)   Before the oocytes could be fertilized, Farmer noticed contamination in the maturation media and determined the oocytes were not viable, so they were discarded that same morning. (Doc. 59-6, pp. 134:17–25, 155:2–12.)

So Gentry and her company sued, alleging: (1) professional negligence against Prell; (2) professional negligence against the Hospital; (3) respondeat superior against the Hospital; (4) vicarious liability under an apparent agency theory against the Hospital; (5) vicarious liability under an actual agency theory against the Hospital; (6) breach of contract against the Hospital; (7) professional negligence against Russell; (8) negligent supervision against Russell; (9) negligent supervision against Prell; (10) vicarious liability against Russell; and (11) vicarious liability against Prell. (Doc. 1.)

The parties filed cross motions for summary judgment. (Docs. 49, 53, 54.) All parties responded. (Docs. 57, 59, 60.) Defendants also moved to exclude two of Plaintiffs' experts, (Docs. 51, 52), and Plaintiffs responded. (Docs. 56, 58.) Plaintiffs also moved for spoliation sanctions based on Defendants' disposal of the oocytes. (Doc. 34.) Judge Lammens entered a R&R recommending that the motion be denied. (Doc. 66.) Plaintiffs objected to the R&R. (Doc. 68.) The motions are ripe.

## STANDARDS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant. *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 759 (11th Cir. 2006). Then the court must decide whether there is "sufficient disagreement to require submission to a jury." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (cleaned up).

Expert testimony may be admitted only if: (1) the expert is qualified; (2) the methodology is reliable; and (3) the testimony is helpful. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The proponent of the expert must establish the opinion is admissible, *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010), but need not prove it is correct, *Lord v. Fairway Elec. Corp.*, 223 F. Supp. 2d 1270, 1279 (M.D. Fla. 2002).

## ANALYSIS

### I.     Plaintiffs' Motion for Summary Judgment (Doc. 49)

Plaintiffs move for summary judgment on all claims. (Doc. 49.) The motion is woefully insufficient. First, it flagrantly violates the Court's Case Management

and Scheduling Order by failing to "include a memorandum of law with pinpoint citations to supporting legal authority." (Doc. 26, p. 12.) The motion cites cases explaining the summary judgment standard generally, but it cites no cases on any of the specific claims at issue. (*See* Doc. 49, pp. 10–12.) The negligence claims do not lay out every element. (*See* Doc. 49, p. 2 ("Plaintiffs have established all of the elements of the Negligence causes of action asserted: Duty, Breach of the Duty and Damages.").) And it does not even address the other causes of action. (*See id. passim*.) Because Plaintiffs have failed to show an absence of a genuine dispute of material fact "on *all* the essential elements of [their] case," their motion is due to be denied in its entirety.[1] *U.S. v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (emphasis added).

## II.     The Hospital and Prell's Motion for Summary Judgment (Doc. 54)

The Hospital and Prell move for summary judgment on all claims against them. (Doc. 54.) They first attack Counts I–V—professional negligence against both, respondeat superior against the Hospital, and two counts of vicarious liability against the Hospital—by arguing that Plaintiffs have not shown any

---

[1] Even on the merits, the circumstances surrounding the ovary removal—the procedure occurred after Dantique died, the procedure was not sterile, and the time between the ovary removal and the oocyte removal—show that there is a genuine dispute as to whether contamination occurred before the Hospital and Prell received the ovaries. (*See* Doc. 49-4, p. 47:1–19; Doc. 59-4, pp. 24:3–25:10, 29:20–30:17); *see Gulfstream Park Racing Ass'n v. Gold Spur Stable, Inc.*, 820 So. 2d 957, 960 (Fla. 4th DCA 2002) ("The issue of negligence, and more specifically, the determination of proximate cause, is ordinarily a question that should be left for a jury.") (collecting cases).

breach of any standard of care. (*Id.* at 5–7.) The Court disagrees. Because Counts I–V all involve negligence in a veterinary context, the relevant standard of care is how a similar veterinarian in the community would act under similar circumstances. *See Trikon Sunrise Assocs., LLC v. Brice Bldg. Co.*, 41 So. 3d 315, 318 (Fla. 4th DCA 2010). Here, Plaintiffs have come forward with multiple facts from which a jury could conclude that the Hospital and Prell acted in a manner contrary to a reasonable veterinarian. While Prell removed the oocytes, she delegated their processing to an office manager, not a licensed veterinary tech. (Doc. 59-6, pp. 28:22–29:20.) Keeping the lab completely sterile may have been an impossible task, but allowing shoes from the outside, not requiring gloves or hair nets, and only laundering lab coats once a week could not have helped. (Doc. 49-2, pp. 133:5–10, 134:2–15.) And even if only some oocytes were originally contaminated, placing all of them into a single vial of maturation media ensured they were all contaminated. (Doc. 59-6, p. 123:8–21.) Coupled with Boswell's opinion that the contamination could only have occurred at the Hospital, there is abundant evidence showing a dispute of fact as to whether the Hospital and Prell breached their duty to act as reasonable veterinarians. *See Trikon*, 41 So. 3d at 318. So summary judgment is inappropriate on Counts I–V.

Next, the Hospital and Prell target Count VI—breach of contract—by arguing that there is no evidence in the record to support a contract for the oocyte

removal. (Doc. 54, pp. 7–8.) Plaintiffs respond that a contract can be oral, but they fail to affirmatively argue that an oral contract existed, let alone lay out its terms or how the Hospital and Prell breached them. (Doc. 60, p. 5.) An oral contract can sustain a breach of contract claim, but a plaintiff must prove its existence, including mutual agreement on all material terms. *See Winter Haven Citrus Growers Ass'n v. Campbell & Sons Fruit Co.*, 773 So. 2d 96, 97 (Fla. 2d DCA 2000). Here, there is no evidence of a contract regarding the oocyte removal at all, other than a written contract between Gentry and the Hospital for transferring any fertilized embryos into a recipient mare, but that contract is silent as to the oocyte removal procedure. (*See* Doc. 54-4.) Without any evidence of the essential terms of a hypothetical contract, Plaintiffs cannot succeed on their breach of contract claim as a matter of law. *See Campbell*, 773 So. 2d at 97. So summary judgment is due to be granted on Count VI.

Prell then attacks Count IX—negligent supervision—by arguing that she had no duty to supervise anyone, but that even if she did, there is no evidence that she knew or had reason to know of any problems with any employee. (Doc. 54, p. 8.) Plaintiffs' response merely recites the elements of negligent supervision. (Doc. 60, pp. 5–6.) "Negligent supervision occurs when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicates his unfitness, and the employer fails to

take further actions such as investigation, discharge, or reassignment." *Dep't of Env't Prot. v. Hardy*, 907 So. 2d 655, 660 (Fla. 5th DCA 2005) (citing *Garcia v. Duffy*, 492 So. 2d 435, 438–39 (Fla. 2d DCA 1986)). Negligent supervision is not limited to employers—supervisors can be sued as well. *See Gabor v. Remington Lodging & Hosp., LLC*, 413 So. 3d 261, 265 (Fla. 5th DCA 2025). Here, taking the facts in the light most favorable to Plaintiffs, Prell allowed Farmer to perform critical tasks regarding the oocyte removal despite knowing that she was an office manager with no formal veterinary education. (Doc. 59-6, pp. 28:22–29:15, 96:1–19, 111:19–112:5.) These are facts from which a jury could reasonably conclude that Prell knew Farmer was unqualified yet allowed her to handle the oocytes and cause contamination. *Hardy*, 907 So. 2d at 661. And even though Prell did not employ Farmer, Prell's supervision of Farmer exposes her to liability for this possible breach. *See Gabor*, 413 So. 3d at 265. So summary judgment is inappropriate on Count IX.

Prell finally moves for summary judgment on Count XI—vicarious liability—arguing that because she did not employ anyone at the Hospital, she cannot be vicariously liable for any employee's negligence. (Doc. 54, p. 9.) Plaintiffs point out that vicarious liability can arise in contexts other than an employer-employee relationship. (Doc. 60, p. 6.) Plaintiffs are correct for that broad proposition. But a manager cannot be vicariously liable for the negligence of their

subordinate. *See Watts v. Wal-Mart Stores E., LP*, 656 F. Supp. 3d 1363, 1368–69 (S.D. Fla. 2023); *White v. Wal-Mart Stores, Inc.*, 918 So. 2d 357, 358 (Fla. 1st DCA 2005) ("[T]o establish liability, the complaining party must allege and prove that the officer or agent owed a duty to the complaining party, and that the duty was breached through personal (as opposed to technical or vicarious) fault."). So while Prell might be held liable for any alleged affirmative negligence on her part—including negligently supervising Farmer—she cannot be vicariously liable for Farmer's negligence as her supervisor, and summary judgment is due to be granted on Count XI. *See White*, 918 So. 2d at 358.

## III.    Russell's Motion for Summary Judgment (Doc. 53)

Russell first moves for summary judgment on Count VII—professional negligence—arguing that because he was not personally involved in the oocyte removal, he did not owe a duty to Plaintiffs or breach that duty. (Doc. 53, pp. 4–5.) Plaintiffs counter that Florida law imposes multiple duties on Russell—including the duty to keep the laboratory clean and to not negligently delegate responsibilities—so summary judgment is inappropriate. (Doc. 57, pp. 6–7.) True, professional regulations can create duties, the breach of which could give rise to negligence. *See McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 n.2 (Fla. 1992) (citing *Restatement (Second) of Torts* § 285 (1965)). And Plaintiffs are correct that Florida regulations require veterinarians to "keep the equipment and premises of the

10

business establishment in a clean and sanitary condition." Fla. Stat. § 474.214(1)(v). But Russell never practiced veterinary medicine at the AFC, and Plaintiffs provide no authority for imputing to a corporate owner the duty of a practicing veterinarian. (Doc. 53-2, pp. 33:25–34:2.) And because Prell's name is on the AFC's license, Florida veterinary regulations make clear that it is Prell's responsibility to maintain the premises. (Doc. 53-2, pp. 8:8–9:15); *see* Fla. Stat. § 474.215(2). So because Russell had no independent duty to keep the premises clean, and because he had no personal involvement with the oocyte removal, summary judgment is due to be granted on Count VII.

Next, Russell attacks Count VIII[2]—negligent supervision—by arguing that he has no duty to supervise anyone at the AFC, nor could he have breached that duty. (Doc. 53, pp. 5–6.) Plaintiffs counter that Russell should have been aware of Prell's alleged negligence. (Doc. 57, pp. 6–7.) Here, assuming Russell had a duty to supervise Prell, he could not have breached that duty because there is nothing in the record indicating he was aware of, or should have been aware of, problems at the AFC. He indisputably had no actual knowledge because Prell ran the AFC herself with no oversight. (Doc. 53-2, pp. 8:8–9:15, 49:6–50:4.) Prell was a qualified veterinarian in her own right, and the AFC operated under her license. (*Id.*) And

---

[2] Russell's motion mislabels the negligent supervision count as Count VII. (Doc. 53, p. 5.)

11

the record does not show a pattern of contamination other than the instant case. Because there is no genuine dispute that Russell neither knew nor should have known of problems with Prell, summary judgment is due to be granted on Count VIII. *See Hardy*, 907 So. 2d at 661.

Finally, Russell moves for summary judgment on Count X—vicarious liability—arguing he cannot be vicariously liable for any negligence committed by Prell, Farmer, or the Hospital. (Doc. 53, p. 6.) As previously discussed, Russell is correct—a manager-subordinate relationship does not give rise to vicarious liability. *See Watts*, 656 F. Supp. 3d at 1368–69.[3] So summary judgment is due to be granted on Count X.

### IV.    Defendants' *Daubert* Motions (Docs. 51, 52)

Defendants first move to exclude Tanja Schnuderl, an equine appraiser. (Doc. 51.) Schnuderl calculated the value of the oocytes by taking the average price of five embryos (which are fertilized oocytes), multiplying that cost by twenty, which was the number of oocytes removed from Dantique's ovaries, and then applying a twenty percent reduction "to accommodate for the 80% success rate of embryo transfers and end up at the fair market value per oocyte." (Doc. 51-1,

---

[3] Plaintiffs briefly cite to Fla. Stat. § 621.07 for the proposition that a corporate officer can be vicariously liable for the negligence of anyone "under that person's direct supervision and control." (Doc. 57, p. 7.) But that statute applies to *professional* LLCs, not ordinary ones like the Hospital. *See* Fla. Stat. § 621.01. And the record is clear that Prell was not under Russell's direct supervision and control. (*See* Doc. 53-2, pp. 49:6–50:4.)  So this argument is inapposite.

pp. 13–14.) Defendants' beef is with the twenty percent reduction. They argue that this adjustment "is not based upon facts or data, and therefore not reliable." (Doc. 51, p. 10.) But challenges to the sources of an expert opinion generally go to weight, not admissibility. *See Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1323 (11th Cir. 2022). "The identification of such flaws in generally reliable [appraisal] evidence is precisely the role of cross-examination," not a basis to exclude testimony as unreliable. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003). Here, Defendants are not attacking the methodology Schnuderl used—in fact, they concede that "her calculation of the 'comparable' figures appears reasonable"—but rather the source of her twenty percent reduction. (Doc. 51, pp. 9–10.) Because attacks on the source of an expert's opinion go to weight and not admissibility, Defendants have not established a basis to exclude Schnuderl's opinions as unreliable. *See Carrizosa*, 47 F.4th at 1323. These attacks are more properly addressed through cross-examination, not exclusion. *See Quiet Tech.*, 326 F.3d at 1345. So Defendants' motion (Doc. 51) is not well taken.

Next, Defendants move to exclude Plaintiffs' veterinary expert, Robert Boswell. (Doc. 52.) Boswell is an equine veterinarian with over forty years of experience. (Doc. 52-1, pp. 1–2.) Boswell's report stated that because "the ovary acts as an impenetrable 'tissue container' for the oocytes," contamination could

13

only have occurred at the Hospital, not when the ovaries were removed. (*Id.* at 3.) He said that contamination could result from improper cleaning and rinsing of the ovaries, and that the oocytes should have been placed in separate vials of separation media so that if one oocyte was contaminated, it would not contaminate the others. (*Id.* at 4.)

At Boswell's deposition on January 16, 2026, when asked whether he could "identify a breach of the standard of care," Boswell responded that a breach occurred at some point during the oocyte removal process. (Doc. 52-2, p. 46:8–20.) More specifically, Boswell pointed to combining all of the oocytes into one vial of separation media and a lack of proper aseptic technique as breaches of that standard. (*Id.* at 68:10–69:4.) Boswell did not include this ultimate conclusion in his report because he "thought it was self-evident." (*Id.* at 55:24–56:8.)

Defendants first take issue with Boswell's testimony that Defendants breached the standard of care, arguing that this is a new opinion that was not timely disclosed in Boswell's report. (Doc. 52, pp. 3–4.) True, Boswell did not use the words "standard of care" in his report except to describe his view of the Hospital's failure to investigate the contamination. (*See* Doc. 52-1, pp. 4–5.) But he did explain that contamination must have occurred at the Hospital; improper cleaning and rinsing of the ovaries could have caused it, and that the oocytes should have been placed in different maturation media. (*Id.* at 3–4.) So Boswell's

14

deposition testimony is not a new opinion—rather, it is the same opinion reworded in response to questioning from Defendants' counsel.[4]

Defendants next argue that Boswell is unqualified because he has never practiced equine reproductive medicine, nor has he fertilized embryos using these procedures. (Doc. 52, pp. 6–9.) But Boswell is not testifying about the specifics of equine reproductive medicine or embryo fertilization. His opinions relate to proper aseptic technique and sources of contamination—broad principles of veterinary medicine that a veterinarian with forty years of experience is certainly qualified to testify to, even if he has not performed the specific procedure at issue. (Doc. 52-1, pp. 1–2); *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 853 (11th Cir. 2021).

Defendants finally argue[5] that Boswell's methodology is unreliable because his opinions are based on "his own assumptions, conclusions, and anecdotes" instead of data and studies. (Doc. 52, pp. 10–12.) But an expert may use their experience to reach non-scientific testimony. *See United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151

---

[4] Even if Boswell's opinion that Defendants breached the standard of care was untimely disclosed, Defendants' counsel's lengthy examination of Boswell during his deposition shows that any delay was harmless. *Cf. Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 825 (11th Cir. 2009) (untimely disclosure not harmless where expert opinions were first disclosed at a *Daubert* hearing instead of in a report or deposition).

[5] Defendants also make a passing reference to Rule 403, but they offer no argument for why Boswell's testimony should be excluded under that rule. (*See* Doc. 52, pp. 6, 13.)

15

(1999)). Here, Boswell reaches his conclusions—on the timing of contamination, causes of contamination, and breaches of the standard of care—through his personal experience as a veterinarian combined with a review of the medical records and relevant depositions, which are reliable bases for his non-scientific opinions. (Doc. 52-1, pp. 1–5); *Frazier*, 387 F.3d at 1262. "Dr. [Boswell] purports to interpret the veterinary records . . . based on [his] expertise and training as a horse veterinarian and [his] knowledge of industry custom. Any analytical weakness in [his] interpretation 'is best left to cross-examination and competing expert testimony, rather than this Court's gate-keeping function.'" *Coombs v. Mitchell*, No. 5:23-cv-70, 2024 WL 4111531, at *3 (M.D. Fla. Sep. 6, 2024) (quoting *Berger v. Philip Morris USA Inc.*, No. 3:09-cv-14157, 2014 WL 10715266, at *2 (M.D. Fla. Aug. 29, 2014)). Defendants' objection to Boswell "failing to use the scientific method is rooted in a disagreement about results and reasoning. It is not, however, based on unreliable methodologies undertaken by [Boswell] in [his] own report." *United States v. Adams*, No. 2:24-cr-122, 2025 WL 2413056, at *6 (S.D. Ala. Aug. 20, 2025). So reliability is satisfied, and Boswell may testify.

## V.   Plaintiffs' Objections to Judge Lammens's R&R (Docs. 66, 68)

Plaintiffs object to Judge Lammens's R&R denying spoliation sanctions. (Doc. 68.) They argue that Judge Lammens erred in finding that Plaintiffs were notified "immediately" that the oocytes were contaminated because they were not

16

notified until the next day. (*Id.* at 2–3.) After an independent *de novo* review of the record, the motions, and the objection, the Court agrees with Judge Lammens's well-reasoned R&R. *See* 28 U.S.C. § 636(b)(1)(C); *Ernest S. ex rel. Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 513 (11th Cir. 1990). "[A]n adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997.) "Mere negligence is not enough." *Vick v. Tex. Emp. Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975). Circumstantial evidence supports a finding of bad faith if the defendant "disposed of the [evidence] in a manner inconsistent with its policies or that the policies themselves somehow establish bad faith." *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1185 (11th Cir. 2020). Here, Defendants acted consistently with their policies in discarding the oocytes because they were nonviable, and nothing in those policies suggests bad faith rather than a pragmatic choice not to retain decaying organic matter indefinitely. (Doc. 49-1, p. 155:2–8); *Tesoriero*, 965 F.3d at 1185. In the absence of bad faith, spoliation sanctions are unwarranted, so Plaintiffs' objections are due to be overruled. *Bashir*, 119 F.3d at 931.

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED**:

1.    Plaintiffs' motion for summary judgment (Doc. 49) is **DENIED**.

2.    The Hospital and Prell's motion for summary judgment (Doc. 54) is

**GRANTED IN PART AND DENIED IN PART**:

    a.    The Motion is **GRANTED** as to Counts VI and XI. Summary judgment on those counts will be entered when the remaining claims are resolved.

    b.    The Motion is **DENIED** as to Counts I–V and IX.

3.    Russell's motion for summary judgment (Doc. 53) is **GRANTED**.

    a.    The Clerk is **DIRECTED** to enter judgment in favor of Russell and against Plaintiffs on Counts VII, VIII, and X only. Plaintiffs shall take nothing on Counts VII, VIII, and X.

    b.    Once judgment is entered on Counts VII, VIII, and X, the Clerk is **DIRECTED** to terminate Russell as a party to this case.

4.    Trial shall proceed on Counts I–V and IX (against the Hospital and Prell only). (Doc. 1, ¶¶ 31–59, 78–83.)

5.    Plaintiffs' objections (Doc. 68) to the R&R (Doc. 66) are **OVERRULED**.

6.    The R&R (Doc. 66) is **ADOPTED**, **CONFIRMED**, and made a part of this Order in its entirety.

7.    Plaintiffs' motion for sanctions (Doc. 34) is **DENIED**.

8.    Defendants' motions to strike Plaintiffs' experts (Docs. 51, 52) are **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on July 2, 2026.

18



ROY B. DALTON, JR.
United States District Judge